# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2023

Lyle W. Cayce
Clerk

No. 19-11300

United States of America,

*Plaintiff—Appellee*,

*versus*

Robert Eugene Stallings,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-217-1

Before Richman, *Chief Judge*, and Graves and Ho, *Circuit Judges*.
Per Curiam:*

Following a three-day jury trial, Robert Eugene Stallings was convicted of one count of communicating false information and hoaxes in violation of 18 U.S.C. § 1038(a)(1). On appeal, Stallings argues that the evidence is insufficient to sustain his conviction, the district court erred in denying his request for several jury instructions, the Government made improper comments during closing arguments, and the district court erred

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

by relying on his bare arrest record to impose an upward departure at sentencing. Because the evidence was sufficient and the district court did not err regarding the jury instructions, closing arguments, or sentencing, we affirm the judgment of the district court.

## I

Robert Eugene Stallings had an account at Wells Fargo Bank through which he received Social Security disability payments. However, Stallings lacked proper photo identification to make cash withdrawals from that account and could not verify a permanent address to obtain a debit card for that account. Accordingly, he was able to access his account only through discretionary withdrawal procedures for limited amounts of cash. In 2018, Stallings entered the Skillman-Abrams branch of Wells Fargo in Dallas, Texas to withdraw money without the required identification. Upon showing a piece of paper with a "mugshot"-type photo, Stallings was allowed to make a small one-time withdrawal. The banker informed Stallings that the "next time he wanted to withdraw funds from the account he would have to bring in a physical form of ID or a debit card." Yet on his subsequent visits to the Skillman-Abrams branch, Stallings did not bring either. Instead, he continued to try to convince the tellers to release cash to him without those "safeguards."

On one occasion, when a teller would not issue cash to Stallings from his account after he showed her "a mugshot picture or some sort of picture of his -- just face," Stallings accused the teller of "holding [his] money hostage." He then made "a big scene, drama," cursing at the bank employees and eventually left. During another unsuccessful withdrawal attempt, Stallings became "really angry," "loud," and "rude." When asked politely to leave, he threw a "giant soda cup at the teller window," knocked down plastic containers with brochures in them, and "shov[ed] everything

down to the floor, again yelling and screaming at everybody, cussing" before he left.  A couple months later, when another teller yet again declined Stallings's withdrawal request—noting that he did not have the proper identification and that she "was aware that he had been disruptive in the bank before"—Stallings became angry, cursed at the teller, and threw a cannister of candy she kept on the counter on the floor.  As the teller attempted to escort Stallings out of the bank, telling him "he was not welcome back in [the Skillman-Abrams] branch," Stallings "turned around just outside" and gestured around his crotch as he continued to curse at the teller.  After the teller reiterated to Stallings that "he was never allowed in the branch again," the branch manager reported the incident to security.

Despite that ban, two months later, Stallings entered the Skillman-Abrams branch with two unmarked duffel bags.  He was not visibly upset and made no verbal threats.  When a banker recognized and approached him, he stated that "he knew he wasn't supposed to be there because of, you know, the things that he had done."  Stallings said he would like to speak to the manager, after a chance "to collect his thoughts."  Throughout this interaction, he "wasn't really looking at" the teller, "just kind of . . . wandering around, looking around."  Before the teller could return with the manager, Stallings left the bank—leaving his bags behind—and walked across the street to a liquor store.

Upon learning of the bags, the manager first contacted security personnel and then the police.  Security personnel told the manager to ask for a police trespass warning—not a bomb squad—and to move the bags herself. The manager asked for a trespass warning, but did not move the bags.  As the Wells Fargo employees waited for the police to arrive, they continued to permit customers to enter and conduct business in the branch. One customer even stood right next to Stallings's bags.  When the police arrived, they evacuated everyone from the building and called a bomb squad to the scene.

A bomb squad officer, Corporal Walton, moved the bags "downrange" and x-rayed them, finding innocuous items inside (e.g., vodka, decorations, a jacket, and papers containing Stallings's identifying information).

Sometime after police arrived, Stallings boarded a bus a few blocks away. As he boarded, the bus driver asked the boarding passengers if they knew what was "going on" at the bank. Stallings responded, "I think they're looking for me, because I left a bomb over across the street at the bank." The driver's son overheard the statement. Stallings calmly continued that he "was having problems at the Wells Fargo" and "was pissed off" at the teller because "she was giving him a hard time," and explained that he "was teaching [the teller] a lesson." After Stallings exited the bus, the driver contacted law enforcement, largely discounting Stallings's story because he did not seem upset and she was used to hearing "all kinds of things" over her years of bus driving.

Two days later, Stallings appeared at another Wells Fargo branch, asking for help locating his bags and claiming memory problems. Upon recognizing him from a circulated photograph, the manager called the police, who subsequently arrested Stallings. The Government later secured a one-count indictment against Stallings under 18 U.S.C. § 1038(a)(1), alleging "that by placing the bags in the bank branch in the specific manner and under the circumstances that he did, he intended to convey false information that indicated that an explosive device had been left at the bank." Prior to trial, Stallings requested jury instructions. The district court proposed alternate language, and while Stallings originally objected, he declined to object when the court proposed a modification. The court ultimately instructed the jury that it had to find the following:

> First, that the defendant intentionally conveyed false or misleading information;

No. 19-11300

Second, that the information was conveyed under circumstances where an imminent threat to personal safety could have been believed by a reasonable person; and

Third, that such information indicated that an activity had taken, was taking, or would take place that would constitute a violation of [18 U.S.C. § 844(i)], prohibitions with respect to explosives.

Evidence presented during trial included testimony of four bank employees from the Skillman-Abrams branch, a host of responding police officers, the bus driver and her son, and witnesses to Stallings's arrest. During closing arguments, the prosecutor made numerous statements drawing objections from defense counsel that were overruled by the district court. Stallings was ultimately convicted. The district court imposed a forty-eight-month sentence of imprisonment, an upward departure from the Guidelines in light of Stallings's criminal history. Stallings timely appealed.

## II

First, Stallings argues that the evidence was insufficient to sustain his conviction under 18 U.S.C. § 1038(a)(1). Because Stallings preserved this issue by moving for acquittal under Federal Rule of Criminal Procedure 29 at the close of the Government's case-in-chief and post-verdict, this court reviews his challenge to the sufficiency of the evidence de novo.[1] In applying this standard, "we review all evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt."[2] We accept "all credibility choices and reasonable

---

[1] *United States v. Harris*, 740 F.3d 956, 962 (5th Cir. 2014) (citing *United States v. Shum*, 496 F.3d 390, 391 (5th Cir. 2007)).

[2] *Id.* (quoting *Shum*, 496 F.3d at 391).

inferences made by the trier of fact which tend to support the verdict."[3] "[A]ny conflict in the evidence must be resolved in favor of the jury's verdict."[4]

It is a crime under 18 U.S.C. § 1038(a)(1) to engage "in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of" 18 U.S.C. § 844(i).[5] Section 844(i) makes it a crime to "maliciously damage[] or destroy[], or attempt[] to damage or destroy, by means of . . . an explosive, any building . . . used in interstate or foreign commerce."[6] Stallings argues that the Government did not meet its burden to prove that the "conduct" identified in the indictment— "placing two bags in the lobby of the Wells Fargo Bank"— "communicated the presence of a bomb," or "that a reasonable person might actually believe" the bags constituted a threat.

## A

Stallings contends that there is insufficient evidence to prove beyond a reasonable doubt that a reasonable person might believe that the bags constituted a threat from Stallings's conduct of leaving the bags in the bank. He argues that the mere act of abandoning bags was innocent conduct of a transient individual (who carried his belongings with him) that a reasonable

---

[3] *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997) (citing *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996)).

[4] *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990)).

[5] 18 U.S.C. § 1038(a)(1).

[6] 18 U.S.C. § 844(i).

person would not believe constituted a threat. Moreover, even "[i]f a reasonable person would think the bags were intended as a threat," Stallings argues, "he or she would not think the threat credible." At most, he contends, a reasonable observer would merely think Stallings was "trying to make the staff clean up after him again," or that maybe there was something "gross" in the bag.

The Government responds that Stallings's background with the bank supports the reasonableness of the belief of a threat from Stallings's conduct of leaving the bags in the bank. It references bank employees' testimony that they were aware of the ongoing dispute about Stallings's account that led to his history of aggressive confrontation at the bank; knew Stallings was banned from the bank; and were concerned by Stallings's leaving of the bags in the bank lobby. One employee testified, "Seriously, the first thing that came to my mind when he just left [the bags] in the lobby was that it might have been something that could hurt us." While it is common for customers to come into the bank with luggage, she continued, "anytime . . . it's just left unattended and the customer walks out, for us that's a major red flag." "[W]hen it comes down to a suitcase or anything bigger, that's something that we have to address right away." The Government also mentions the testimony that Stallings had previously shown two employees a mugshot of himself in an unsuccessful attempt to provide photo identification.

In a sufficiency-of-the-evidence review, this court applies "a rule of reason, knowing that the jury may properly rely on their common sense and evaluate the facts in light of their knowledge and the natural tendencies and inclinations of human beings."[7] Because "it is not necessary that the

---

[7] *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Mulderig*, 120 F.3d 534, 547 (5th Cir. 1997)).

evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,"[8] we conclude there was sufficient evidence to support the jury's determination that a reasonable person would believe that Stallings's conduct of leaving the bags in the bank constituted a threat.

## B

Stallings also contends that, even if "a reasonable person thought that the bags represented a credible threat of [a] terrorist attack," there is insufficient evidence that a reasonable person would think "they were a credible threat of explosives specifically." He correctly argues that the "[indicative] verbs—has, is, [and] will—following 'indicates' [in § 1038(a)] foreclose any prosecution on the basis of" an ambiguous act with nothing to suggest the bags' contents.[9]

Stallings references the testimony of three bank witnesses who agreed that they did not know what was in the bags, as in whether the bags contained a bomb or some other dangerous substance, such as poison gas or a biological agent. Stallings then discusses the subjective actions of the individuals present on the day of the incident as proof that they did not have a reasonable belief that the bags contained explosives, although he acknowledges that the statute does not turn on those employees' subjective beliefs. The actions on which Stallings relies include the bank manager delaying in calling the police because there was no "imminent" "physical threat"; the employees continuing to conduct business in the bank and permitting customers to enter

---

[8] *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (brackets omitted) (quoting *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999)).

[9] *See* 18 U.S.C. § 1038(a)(1).

after Stallings left the bags; and the police lacking the kind of urgency normally exhibited for a bomb threat.

The Government argues that it is commonly understood that the reason for the threat of unattended bags is because they "pose a risk of explosives being present," and "[a]fter all, non-explosive items are only dangerous to someone who opens or handles the bags." It cites the testimony of multiple bank employees who responded in the affirmative when asked if they had "any concern that the bags may contain explosives." The Government contends that is why the bank manager called the police, who ultimately deployed the bomb squad.

Given that our review is "highly deferential to the verdict"[10] and "limited to whether the jury's verdict was reasonable, not whether we believe it to be correct,"[11] there is sufficient evidence to support the jury's determination that a reasonable person could believe that Stallings's conduct of leaving the bags in the bank indicated the specific presence of explosives. While there is evidence to the contrary, "any conflict in the evidence must be resolved in favor of the jury's verdict."[12] We affirm the district court's judgment as to Stallings's first issue.

## III

Second, Stallings argues that the district court erred by declining to give four of Stallings's proposed jury instructions. Because a "district court has substantial latitude in framing jury instructions," we generally review the

---

[10] *Moreno-Gonzalez*, 662 F.3d at 372 (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002)).

[11] *Id.* (quoting *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)).

[12] *Id.* (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990)).

court's refusal to give a proposed instruction for an abuse of discretion.[13] However, "when a jury instruction hinges on a question of statutory construction, our review is de novo."[14]   For reversal, Stallings must demonstrate that: (1) the requested instruction was "substantially correct"; (2) "the requested issue is not substantially covered in the charge"; and (3) "the instruction concerns an important point in the trial such that its absence seriously impaired [his] ability to effectively present a given defense."[15]

## A

Stallings proposed, and the district court rejected, the following three instructions requiring proof that Stallings intended to communicate the presence of a bomb:

> 1.      The   jury   may   "convict   the   defendant   if he . . . undertook an action with intent falsely to convey that he would maliciously damage, destroy, or attempt to damage or destroy real or personal property by means of fire or explosive";
>
> 2.      The Government must have proved beyond a reasonable doubt "[t]hat the information the defendant sought to convey was that an activity had taken, was taking, or would take place constituting a violation of 18 U.S.C. 844(i)";
>
> 3.      "It is not sufficient that he intended to communicate some other false or misleading information, but in fact communicated the presence of a bomb."

---

[13] *United States v. Richardson*, 676 F.3d 491, 506-07 (5th Cir. 2012).

[14] *United States v. Brooks*, 681 F.3d 678, 697-98 (5th Cir. 2012) (brackets and internal quotation marks omitted) (quoting *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011)).

[15] *United States v. Toure*, 965 F.3d 393, 402-03 (5th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Daniel*, 933 F.3d 370, 379 (5th Cir. 2019)).

No. 19-11300

The first instruction is an incorrect statement of the law. Section 1038(a)(1) requires only that Stallings intentionally convey false or misleading information that "indicates that an activity has taken, is taking, or will take place that would constitute a violation of" § 844(i).[16]  Congress chose to word the statute in a way that did not assign an agent to the "activity."  As the Government correctly contends, Stallings's requested instruction incorrectly narrows § 1038(a)(1) by requiring "proof that the defendant undertake action intending to convey that *he* is the person who will maliciously cause damage or destruction by way of an explosive."  The district court did not err in declining the first instruction.

As for the latter two instructions, both were substantially covered in the charge issued.  The first and third elements of the charge—requiring that the jury must find beyond a reasonable doubt "that the defendant intentionally conveyed false or misleading information" and "that *such information* indicated that an activity had taken, was taking, or would take place that would constitute a violation of [§ 844(i)], prohibitions with respect to explosives"—substantially covered Stallings's requested instructions. Stallings's second instruction would have replaced the words "such information" with "the information the defendant sought to convey."  As the Government observes, "[t]here is little daylight between the court's use of" the two phrases because they are "effectively synonymous."

The third requested instruction would have clarified the words "such information" to mean information that "in fact communicated the presence of a bomb," which the Government correctly argues the charge already did by using the word "such" before "information."  Stallings's own arguments regarding the importance of "such" in connecting the two uses of

---

[16] 18 U.S.C. § 1038(a)(1).

No. 19-11300

"information" in § 1038(a)(1) support this conclusion. Therefore, the district court did not abuse its discretion in declining to issue the latter two requested instructions.

**B**

Stallings proposed, and the district court rejected, the following instruction requiring proof that Stallings intended to communicate reasonably believable information:

> In order to convict the defendant, you must find beyond a reasonable doubt that he intended that the information he communicated—namely the occurrence of a violation of 18 U.S.C. 844(i) . . . —be reasonably believable.

The requested instruction is an incorrect statement of the law. Stallings's unsupported interpretation of § 1038(a)(1) imports the mens rea requirement from the first part of the statute—"intent to convey false or misleading information"—to the second part of the statute—"where such information may reasonably be believed."[17] The Ninth Circuit rejected this interpretation outright in *United States v. Castagana*.[18] In *Castagana*, the Ninth Circuit held that the phrasing of § 1038(a) "clearly indicate[s] that Congress intended to apply an objective standard to the second part of the statute, explicitly distinguished from the initial portion to which the explicit subjective intent requirement applies."[19] Moreover, "it makes little sense to say that a perpetrator can *intend* that anything be 'reasonably believed.'"[20] The court further determined that although it "need not rely on legislative

---

[17] *See* 18 U.S.C. § 1038(a)(1).

[18] 604 F.3d 1160, 1163-64 (9th Cir. 2010).

[19] *Id.* at 1163.

[20] *Id.* (emphasis in original).

No. 19-11300

history because the statute is unambiguous, the legislative history of the statute and common sense support this interpretation."[21]

We agree with the Ninth Circuit's analysis. The district court did not err in declining to issue Stallings's fourth proposed jury instruction because it is not a substantially correct statement of the law.

## IV

Third, Stallings argues that the district court abused its discretion by overruling Stallings's objections to various statements made by the Government in its closing argument, and that the district court plainly erred by failing to intervene regarding other allegedly improper statements made by the Government in closing.

For both sets of statements, "we must first decide whether the prosecutor made an improper remark," and if she did, "we must determine whether the remark affected the substantial rights of the defendant."[22] Regarding improper remarks, "[a] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence."[23] "The sole purpose of closing argument is to assist the jury in analyzing, evaluating[,] and applying the evidence."[24] In "determining whether a prosecutor's comment was improper, it is necessary to look at the comment

---

[21] *Id.* at 1164.

[22] *United States v. Alaniz*, 726 F.3d 586, 615 (5th Cir. 2013) (quoting *United States v. Gracia*, 522 F.3d 597, 600 n.2 (5th Cir. 2008)).

[23] *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

[24] *Id.* (quoting *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981)).

in context."[25]  Regarding substantial rights, they are affected when the error "affected the outcome of the district court proceedings."[26]  More specifically, "we assess the magnitude of the statement's prejudice, the effect of any cautionary instructions given, and the strength of the evidence of the defendant's guilt."[27]

## A

We review for abuse of discretion the three sets of statements to which Stallings objected and that the district court admitted over his objection.[28]

### i

Prior to closing arguments, when defense counsel was cross-examining the supervisor of Corporal Walton—the officer who took the x-rays of Stallings's bags—counsel mentioned that Walton was not testifying that day and asked the supervisor if he was aware of anything that would prevent Walton from testifying.  The supervisor responded that he believed Corporal Walton was on a "Brady list," meaning that "there's information about that officer" regarding "things in his past" "that would make him look bad."  Later, in closing arguments, defense counsel noted in passing that the prosecution had not called Corporal Walton, despite his role.  When the prosecution responded, the following exchange occurred:

> [PROSECUTION:] You heard today there was sort of a suggestion that Senior Corporal Walton didn't testify and that

---

[25] *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (quoting *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004)).

[26] *Id.* at 496 (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

[27] *Alaniz*, 726 F.3d at 615 (internal quotation marks omitted) (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)).

[28] *Id.* (citing *United States v. Gracia*, 522 F.3d 597, 600 n.2 (5th Cir. 2008)).

you should take something from that.  This man put his -- put on a bomb suit, not knowing what was in it.

[DEFENSE]: Objection, bolstering.

THE COURT: Overruled.

[PROSECUTION]: This man protects this community for 20 years because something in a paper --

[DEFENSE]: Objection, facts not evidence.

[THE COURT]: Overruled.

[PROSECUTION]: They're going to try and suggest that you should impugn his actions that day.  He had no idea.  Nobody out there knew what was in those bags except for the man that got on the bus, the man that walked away, snickering the whole way.  "They're looking for me.  I'm going to teach her."

Stallings argues that the prosecution's statements were inflammatory, bolstering arguments—appealing directly to the bravery of Walton and contrasting his heroism to Stallings, "a despicable man 'snickering' about his plan to 'teach' a lesson to a female teller"—that were irrelevant to the issue before the jury.  The Government argues these statements were instead "(i) a direct response to defense counsel's attempt to discredit Walton when cross-examining his supervisor, and (ii) merely restated evidence in the record."

Generally, "it is impermissible for a prosecutor to" bolster a law-enforcement witness, i.e., "make a largely emotional appeal to the jury to credit . . . officers' testimony because they are police officers."[29]  However, a prosecutor may "present what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order

---

[29] *United States v. Kiekow*, 872 F.3d 236, 254 (5th Cir. 2017) (brackets and internal quotation marks omitted) (quoting *McCann*, 613 F.3d at 496).

to remove any stigma cast upon the prosecutor or his witnesses."[30] Prosecutors should still be allowed to "present rebuttal that is appropriate in scope and that does not suggest the existence of information not in evidence."[31]

The rebuttal here was appropriate in scope as it responded specifically to assertions made by defense counsel in closing to remove stigma cast upon Corporal Walton by the defense. Every statement the prosecutor made on rebuttal about Walton was in evidence—elicited on redirect by the government after defense counsel cross-examined his supervisor. Accordingly, the rebuttal was acceptable. Moreover, the statements about Corporal Walton were not inflammatory, irrelevant, or impermissible bolstering.[32] These statements were not improper remarks.

## ii

In closing, defense counsel noted that bank employees waited to clear the bank, let customers enter after discovering the bags, and remained inside themselves, all before the bags were relocated. The prosecution responded on rebuttal:

> [PROSECUTION:] A reasonable person who sees the Defendant walk in and place the bags at 10:43, who hears the Defendant ask to speak to a manager, who then sees the

---

[30] *United States v. Thomas*, 12 F.3d 1350, 1367 (5th Cir. 1994) (brackets omitted) (quoting *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981)).

[31] *Kiekow*, 872 F.3d at 255.

[32] *Compare United States v. Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011) (holding argument improper when prosecutors said that agents "put their life on the line, protecting us and our kids" and therefore "get[] a sad deal" when accused of lying), *and McCann*, 613 F.3d at 494, 496 (holding argument improper when the prosecution demanded an "apolog[y] to NOPD officers who wear bulletproof vests because they have to worry about getting shot at on the street and then they come here in court and they get shot at again").

Defendant walk across the street, they had the ability to make - - and they had to make it. I mean, this isn't a situation where somebody is pointing a gun at them. It's a different type of situation.

[Defense counsel], evidently, she would do things differently. Good for her. These women didn't go running, screaming from the bank. [Defense counsel] evidently would have.

[DEFENSE]: Objection, denigrating the defense.

THE COURT: Overruled.

[PROSECUTION]: That's what [defense counsel] wants you to believe they should have done, run screaming from the bank.

Stallings argues this was "quite plainly a personal attack" that undermined defense counsel's credibility before the jury. The Government argues the "comment was a direct response to defense counsel's argument that the bank employees' failure to run out of the bank showed that they were not really afraid."

"[N]o prosecutor . . . may impugn the integrity of a particular lawyer . . . , without basis in fact, as a means of imputing guilt to a defendant."[33] But the general rule against attacking the integrity of defense counsel does not extend to specific attacks on defense counsel's *arguments*.[34] First, the statements at issue did not impugn the integrity of defense counsel because they related to how defense might have acted differently if she thought the bags contained explosives, with the prosecution commenting "[g]ood for her." Second, Stallings acknowledges that the attack was not directed at defense counsel personally, but rather "deflect[ed] a central

---

[33] *United States v. Valas*, 822 F.3d 228, 245 (5th Cir 2016) (quoting *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980)).

[34] *See United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002).

No. 19-11300

argument of the defense: that the behavior of bank employees belied any serious bomb threat."[35]  Third, the prosecutor's statement about employees not "run[ning] screaming from the bank" is acceptable hyperbole because it was an inference based on the evidence.[36]  In sum, the remarks were not improper.

### iii

Stallings asserts that the "defense offered three serious challenges to the [G]overnment's proof of the charged offense": the behavior of the bank employees showed no subjective fear of a bomb, the bus driver was in a divided state of attention when she heard Stallings's statements, and the testimony of the driver's son changed.  In rebuttal, Stallings alleges, the prosecution improperly treated these challenges as personal attacks on the witnesses to be rejected as "victim blaming."  The prosecution argued:

> [PROSECUTION:] Like I said, they victim blamed five ways from Sunday.
>
> [DEFENSE]: Objection, denigrating the defense.
>
> THE COURT: Overruled.
>
> [PROSECUTION]: It's easy for the defense to sit here and argue after the fact as to how someone should act.  That's easy to do.  But none of these women had ever been through this before, and they did the best they could.

---

[35] *Cf. id.* at 487-88 (prosecutorial comments referring to various defense arguments as a "rabbit trail" and "red herring" held to not have denied defendant a fair trial).

[36] *Cf. United States v. Thompson*, 482 F.3d 781, 785-86 (5th Cir. 2007) (concluding "prosecutor's remarks were not actionably improper" despite "a bit of oratory and hyperbole"); *Foy v. Donnelly*, 959 F.2d 1307, 1318 (5th Cir. 1992) (concluding inaccurate statement implying defendant had criminal history "did not equate to a due process violation" when evidence of criminal history had been introduced at trial).

No. 19-11300

The Government argues this "was a permissible characterization of specific defense arguments that attacked the credibility of government witnesses on various grounds." Because a prosecutor can present a bolstering argument—i.e., make a largely emotional appeal—"if it is specifically in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon the" prosecution's witnesses,[37] the "victim blaming" remarks were not improper.

**B**

Stallings claims the district court failed to intervene regarding certain statements even though Stallings did not object. Unpreserved error is reviewed under the plain error standard.[38] Stallings contends that when a "prosecutor's closing argument repeatedly interferes with the defendant's right to a fair trial," "objections may be of little utility," and thus this court should apply a more relaxed plain error standard. He is incorrect, as we have "not [applied] a diluted version of the plain-error standard.[39] So, Stallings must show "(1) there was error, i.e., the prosecutor's remarks were

---

[37] *See supra* note 30 and accompanying text.

[38] *United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011) (citing *United States v. Gracia*, 522 F.3d 597, 599-600 (5th Cir. 2008)).

[39] *United States v. Johnson*, 943 F.3d 214, 224 n.3 (5th Cir. 2019) (first citing *Aguilar*, 645 F.3d at 323; and then citing *Gracia*, 522 F.3d at 603).

improper, (2) the error was plain and obvious, and (3) the error affected his substantial rights."[40]

**i**

In the prosecution's initial closing statement , referring to Stallings's videoed, post-arrest statement, the prosecutor argued:

> [PROSECUTION:] When you watch [the videos] several times, you'll start to see certain things, certain comments stand out.
>
> . . . .
>
> Again, watch the videos, look at the evidence, take the time.
>
> . . . .
>
> Remember his words [in the video]: "No threats ever. Oh, no, no threats. I don't do shit like that at my bank."
>
> Really? Can we believe you? What did you do two months before that?
>
> . . . .
>
> If these statements existed in a vacuum, sure, there might be some credibility to them, but remember what he said two days before. Remember what he did two days before.
>
> He ascribes it to short-term memory loss. That's all we know. He doesn't explain it, doesn't say anything more.
>
> [Fifth Amendment objection by defense counsel]
>
> [PROSECUTION]: Let me qualify that. He doesn't state it on the video. He doesn't explain it.
>
> And [defense counsel] brings up a good point, and I'll shift to that real quickly. Fifth Amendment. The Defendant

---

[40] *Aguilar*, 645 F.3d at 323 (citing *Gracia*, 522 F.3d at 600).

doesn't have to do anything in this case.  The Government
bears the full burden.  We accept that burden.

As this instruction will tell you, it is a heavy burden, it is
a strict burden, and we accept it.  And we have met that burden.
He doesn't have to do anything.

But one note on that.  Evidence in this case is his own
statements.  And you can consider those.  There is no Fifth
Amendment protection to the evidence of his statements that
have been introduced in this case.  And that's why I'm saying
go back and watch those recordings.  They are very, very
telling.  His story doesn't hold water.

Stallings argues that the prosecutor "crossed the line by saying '[h]e
doesn't explain it, doesn't say anything more'" before defense counsel's
objection.  Further, Stallings contends that the prosecutor improperly
commented on Stallings's exercise of the Fifth Amendment after defense
counsel's objection.  The Government argues that instead the prosecutor
"made a permissible argument about a comment Stallings made in a recorded
interview—which was properly admitted into evidence—and Stallings's
failure to explain further *in the video*."  Additionally, the Government
contends that the prosecutor "properly responded to defense counsel's
unfounded Fifth Amendment objection by telling the jury that the
[G]overnment (not the defendant) has the burden of proof at trial."

Generally, prosecutors are prohibited from commenting—directly or
indirectly—on a defendant's failure to testify in a criminal case,[41] regardless
of the "prosecutor's subjective intent in making the remarks."[42]    "A

---

[41] *See Rhoades v. Davis*, 852 F.3d 422, 432-33 (5th Cir. 2017) (quoting *United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010)).

[42] *Gongora v. Thaler*, 710 F.3d 267, 277 (5th Cir. 2013) (per curiam) (citing *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999)).

prosecutor's remarks constitute impermissible comment on a defendant's right not to testify[] if the prosecutor's manifest intent was to comment on the defendant's silence or if the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." [43]

As for the prosecutor's statements pre-objection, given the failure by Stallings to cite Fifth Circuit controlling authority on the issue—which typically "mean[s] that there was not plain error" [44]—the error of the court to intervene *sua sponte* was not plain or obvious. Thus, the pre-objection statement cannot constitute reversal.

As for the comments after the Fifth Amendment objection, by emphasizing that the jury focus on "the evidence of [Stallings's] statements that have been introduced in the case" and stating that Stallings's "story doesn't hold water," the prosecutor, post-objection, focused more on what Stallings said rather than his silence. Consequently, the jury would not naturally and necessarily construe those statements as a comment on Stallings's silence. The district court did not plainly err in failing to intervene when the Government made them.

---

[43] *United States v. Johnston*, 127 F.3d 380, 396 (5th Cir. 1997) (citing *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir. 1992)).

[44] *United States v. Rodriguez-Parra*, 581 F.3d 227, 231 (5th Cir. 2009) (citing *United States v. Garcia-Rodriguez*, 415 F.3d 452, 456 (5th Cir. 2005)); *see also United States v. Segura*, 747 F.3d 323, 330 (5th Cir. 2014) (declining to hold plain error because "Segura cite[d] no Fifth Circuit authority that would make the district court's error clear or obvious").

No. 19-11300

## ii

Referring to the bags Stallings left in the bank, the prosecutor stated in rebuttal closing:

> Empty bags and a bottle of vodka. There's no explanation from that witness stand as to why there's empty bags there. None of his stuff is in that bag. A bunch of junk is in the bags. Not even a bunch.

Stallings argues this was improper because a "prosecutor's commentary on missing evidence crosses the Fifth Amendment line if the missing evidence could only have been provided by the defendant, and only Stallings could know why his bags contained so few objects and provide an "explanation [of such] *from the witness stand*." The Government argues that instead the prosecutor "noted the lack of evidence *for a specific defense theory of the case* that counsel argued throughout the trial."

Usually "a comment on the failure of the defense to counter or explain the evidence presented,"[45] or to present evidence to support a defense or theory of the case, is permissible.[46] One of Stallings's central defenses at trial, and arguments on this appeal, is that Stallings was a transient man and

---

[45] *See United States v. Iredia*, 866 F.2d 114, 118 (5th Cir. 1989) (per curiam) (citing *United States v. Soudan*, 812 F.2d 920, 930 (5th Cir. 1986) (per curiam)).

[46] *See United States v. Casel*, 995 F.2d 1299, 1308 (5th Cir. 1993) ("Since the prosecutor's comments were intended as a statement that the defense had failed to produce any evidence of a defense he was advancing, rather than as a statement about the silence of the defendant himself, then the comments cannot form the basis for a reversal." (citations omitted)), *vacated on other grounds as to one defendant sub nom. Reed v. United States*, 510 U.S. 1188 (1994); *Soudan*, 812 F.2d at 930 ("The record reflects that the prosecutor was not commenting upon appellant's failure to testify. Rather, he was commenting upon the fair and reasonable inferences to be drawn from the evidence which had been presented, and the defense theory which had holes in its web. The prosecutor's comments only served to focus that evidence which had been elicited during trial upon the government's theory of the case.").

there was nothing unusual about him carrying two duffel bags around.[47]   In response, the Government commented "that the bags were essentially empty and did not contain all of Stallings's possessions," as a transient person's would, as Stallings had suggested.   The Government argued that Stallings provided no explanation for why the bags were empty.

While Stallings correctly points out that the prosecutor may not comment on missing evidence if the defendant is the only knowledgeable witness who could have supplied it,[48] Stallings does not provide any support for the assertion that he was the only person who could comment on his transient nature or why his bags were essentially empty.   For example, the defense might have presented the testimony of the McDonald's manager who "allowed [Stallings] to stay on the [McDonald's] property in exchange for keeping trespassers off of the land."   Stallings "previously spent many hours at the restaurant during the day for shelter and to eat and, on one occasion, repaired a sink for the manager."   This manager might have known enough about Stallings, his transient nature, and the bags he kept with him to testify in support of Stallings.

The district court did not plainly err in failing to intervene.

---

[47] *See supra* Section II.A.

[48] *See United States v. Sardelli*, 813 F.2d 654, 657 (5th Cir. 1987) ("Where arguably favorable evidence other than the defendant's own testimony is available to him, comment upon his failure to produce it may be justified.  However, in the instant case, it is quite obvious that the prosecutor's comments referred to Sardelli, since the only knowledgeable witnesses other than Sardelli himself had been produced by the Government." (citations omitted)).

### iii

In the prosecution's initial closing statement, the prosecutor argued:

> The bank staff, when he walked in, that's the threat to them. They see this man who's been there before. He's the message. "I'm here. I'm going to leave these bags, and I'm going to walk out."

> They knew him. They knew how he had treated them when he said no to them. And remember what they told you, the way he acted, his yelling, his profanity, his temper tantrums, his abuse of the banks and their personal property, his inappropriate sexual gestures. That was his calling card. That's what they saw when that man walked into the bank on . . . December the 8th.

> And remember [the two bank employees]? They had seen what they termed a mugshot ID. It looked like a mugshot. So they maybe had some idea what this man was about.

Stallings now argues that by using the phrase "what this man was about" the prosecutor urged the jury to convict Stallings based on a prior arrest or general bad character under Federal Rule of Evidence 404(b). The Government responds that the prosecutor "argued that Stallings showed the bank employees a mug shot of himself in order to intimidate them and show them that he was possibly dangerous," which "was a proper comment on a piece of evidence that was admitted for exactly this purpose."

Pre-trial, Stallings sought to exclude the "mug shot" evidence, arguing that it was overly prejudicial. The district court overruled the objection because it held the photo was "logically related to the offense charged" and that the Government did not intend to use it as evidence of Stallings's criminal history not connected to this crime. Reading the

challenged comment in context,[49] the prosecutor was not urging the jury to convict Stallings on the ground of bad character irrespective of guilt. Rather, the prosecutor was arguing that Stallings used the mug shot to tell the bank employees "what [he] was about," leading the bank employees to believe Stallings was dangerous. Moreover, Stallings cannot establish plain error because he cites no controlling Fifth Circuit authority on the issue.[50]

**iv**

In rebuttal closing, the prosecutor argued:

> Going across the street to a location where he could see and just waiting. He got what he wanted. He enjoyed every minute of it. You heard that the first officer didn't arrive until approximately 11:08. That's 25 minutes after the Defendant walked out of the bank. What in the world was that man doing for 25 minutes? I would submit to you, ladies and gentlemen, he was just watching and waiting to see if the little game he was playing worked. And lo and behold, it didn't.

Later, the prosecutor added that Stallings was "the man that got on the bus, the man that walked away, snickering the whole way" saying "They're looking for me. I'm going to teach [the teller]." Stallings argues this was an improper attempt to inflame the jury's passion, going "beyond the evidence and attack[ing] [Stallings's] character or veracity."[51] The Government responds that the prosecutor "engaged in a bit of oratory and hyperbole, as trial lawyers are w[o]nt to do in closing arguments."[52] Moreover, the

---

[49] *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (quoting *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004)).

[50] *See supra* note 44 and accompanying text.

[51] *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (en banc) (citing *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1237-38 (5th Cir. 1990)).

[52] *United States v. Thompson*, 482 F.3d 781, 786 (5th Cir. 2007).

No. 19-11300

Government argues, the "comment had a basis in the evidence—Stallings bragging to the bus driver that he left a bomb in the bank to teach the manager a lesson—which would have been clear to the jury from the evidence and argument it had already heard" showing Stallings was "pleased with himself."

While there was evidence to support much of what the prosecutor argued, there was no evidence that Stallings was watching the bank for twenty-five minutes while "snickering."  "An inference not reasonably deducible from the evidence may not be stated."[53]  Accordingly, the prosecutor's remarks were improper.  Also, the failure of the district court to intervene was plain and obvious, as Stallings cites a relevant Fifth Circuit case for support.[54]  As for whether the error affected Stallings's substantial rights, "efforts to inflame jurors through argument that characterizes a defendant in the most despicable manner will be seen as creating a high risk of prejudice."[55]  However, given that Stallings concedes the sufficiency of the evidence on the intent element of § 1038(a), Stallings cannot demonstrate that the prosecutor's statements affected the outcome of the district court

---

[53] *Hall v. United States*, 419 F.2d 582, 585 (5th Cir. 1969) (citing *Luttrell v. United States*, 320 F.2d 462, 465 (5th Cir. 1963)).

[54] *Id.* (holding that the "prosecutor could not properly deduce from the fact of a wink the inference of an affirmative undertaking by [the witness] to 'help' his 'old buddy,'" the defendant, and thus that those comments by the prosecutor were improper); *see also id.* ("[The prosecutor's statement] was supported only by the improper implication that there was existent, but unstated, evidence of which the jury did not have the benefit." (citing *McMillian v. United States*, 363 F.2d 165 (5th Cir. 1966))).

[55] *United States v. Mendoza*, 522 F.3d 482, 495 (5th Cir. 2008).

proceedings and thus affected Stallings's substantial rights.[56]   Therefore, Stallings cannot prevail under the plain error standard.

**v**

During rebuttal closing, the prosecutor argued:

> Did the Defendant intend to create a bomb hoax?   His actions . . . show he did.  His words on the day of show he did.  Would a reasonable person believe there was a bomb?  You better believe it.  "They're looking for me.  I left a bomb in there.  I had a problem with a white female teller, and I'm going to teach her."  Ladies and gentlemen, I ask that you find this man guilty and show him that in the United States of America this is a crime.

Stallings contends that this argument amounts to constructive amendment or fatal variance because the indictment named only Stallings's leaving the bags as the "conduct" from which a reasonable person might infer the presence of a bomb, while the prosecutor urged the jury to rely on Stallings's statements to the bus driver as the "conduct."  However, as the Government correctly contends, the prosecution "never argued or even implied to the jury that Stallings's statements to the bus driver were evidence of whether the bank employees would have reasonably feared that there was a bomb in his bags."  Before closing, the Government argues, the prosecution "had already very clearly told the jury—at great length—that Stallings's statement to the bus driver was evidence of his *intent*, which Stallings concedes on appeal."  Thus, the prosecutor's statement in closing was mere

---

[56] *See United States v. Alaniz*, 726 F.3d 586, 615 (5th Cir. 2013) ("To determine whether a remark prejudiced the defendant's substantial rights, we assess the magnitude of the statement's prejudice, the effect of any cautionary instructions given, and the strength of the evidence of the defendant's guilt." (internal quotation marks omitted) (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999))).

No. 19-11300

"rhetorical flourish, a reminder of the most damning piece of evidence against Stallings," and was not improper.  Further, because Stallings has already conceded the sufficiency of the evidence on the intent element,[57] he cannot demonstrate that this comment affected his substantial rights.[58]

In sum, Stallings cannot prevail under the plain error standard regarding all five of the prosecutor's remarks to which defense counsel failed to object.

## V

Last, Stallings argues that the district court's consideration of "numerous bare arrest records in its choice of an above-range sentence" "flatly contradicts the controlling precedent of this [c]ourt."  Because Stallings failed to object to the upward departure from the Sentencing Guidelines, we review for plain error.[59]

A district court may not rely on a "bare arrest record" to extend a defendant's sentence.[60]  An arrest record is "bare" if it refers "to the mere fact of an arrest—i.e., the date, charge, jurisdiction[,] and disposition— without corresponding information about the underlying facts or circumstances regarding the defendant's conduct that led to the arrest."[61]

The Presentence Investigation Report (PSR) assigned Stallings a total offense level of 12 and a criminal-history category of VI, for an advisory

---

[57] *See supra* note 55 and accompanying text.

[58] *See supra* note 56 and accompanying text.

[59] *United States v. Peltier*, 505 F.3d 389, 392 (5th Cir. 2007), *abrogated on other grounds by Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020).

[60] *United States v. Windless*, 719 F.3d 415, 420 (5th Cir. 2013).

[61] *Id.* (brackets and emphasis omitted) (quoting *United States v. Harris*, 702 F.3d 226, 229 (5th Cir. 2012) (per curiam)).

guideline range of 30 to 37 months' imprisonment. Paragraph 162 of the PSR recommended that the district court impose an upward departure in light of Stallings's criminal history, citing 39 adult convictions and "34 offenses that were either dismissed due to pleas in other cases or for unknown reasons." The PSR concedes that the circumstances of the 34 alleged offenses are unavailable, making the arrest records for those offenses "bare."

The district court departed upwardly from the guideline range, twice stating that it imposed a variance "for the reasons stated in paragraphs 162 and 163 of the [PSR]." However, the court's comments at sentencing clarified that it focused only on Stallings's adult convictions, not his juvenile offenses or unadjudicated conduct. Moreover, the court and the PSR specifically referenced the fact that Stallings's *convictions* that received criminal-history points amounted to a criminal-history score of almost double the amount needed for criminal-history category VI. The court thus followed the Guidelines' directive, determined a new offense level and criminal-history category of VI—yielding a new Guideline range of 41 to 51 months' imprisonment—and imposed a sentence of 48 months' imprisonment. Notably, the court recognized that even "if it were later determined that one or more of the points that [Stallings] received in the criminal history was not countable for some reason," it would "impose the same sentence as a variance." Thus, the district court did not plainly err because it did not consider Stallings's bare arrest records at sentencing.

Even if the court's brief reference to "the reasons stated in paragraphs 162 and 163" demonstrated that the district court considered Stallings's unadjudicated conduct, Stallings cannot show that the court's consideration affected his substantial rights. Stallings had 39 adult convictions, with only 16 receiving criminal-history points. The "scored" convictions gave a score of 24, eleven points more than necessary to reach the highest criminal-history category, VI. There is nothing to indicate that had the PSR and district court

No. 19-11300

completely excluded the 34 unadjudicated offenses, Stallings would have received a lower sentence.  Stallings's substantial rights were not affected, and he cannot prevail under the plain error standard.

*     *     *

For the foregoing reasons, we AFFIRM the judgment of the district court.